Exhibit A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )   DOCKET NO. 3:17-CR-181
                                )
      vs.                  )
                                )
JORDAN LEE MOORE,           )
                                )
          Defendant.      )
_____)

TRANSCRIPT OF BOND REVIEW HEARING
BEFORE THE HONORABLE DAVID S. CAYER
UNITED STATES MAGISTRATE JUDGE
JUNE 30, 2017

APPEARANCES:

On Behalf of the Government:

    THOMAS A. O'MALLEY, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    PETER ADOLF, ESQ.
    Federal Public Defender's Office
    129 West Trade Street, Suite 300
    Charlotte, North Carolina

Digitally recorded proceedings transcribed by:

        Cheryl A. Nuccio, RMR-CRR
        Official Court Reporter
        United States District Court
        Charlotte, North Carolina

1

<u>I N D E X</u>

2 <u>GOVERNMENT'S WITNESSES</u>                                      <u>PAGE</u>

3 <u>DEBORAH FACKRELL</u>
    Direct Examination By Mr. O'Malley            24
4    Cross Examination By Mr. Adolf               26

5 <u>ROSS BAKER</u>
    Direct Examination By Mr. O'Malley            31
6    Cross Examination By Mr. Adolf               32

7 <u>CLIFF JOHNSON</u>
    Direct Examination By Mr. O'Malley            35

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

      (Transcript of proceedings digitally recorded on June 30, 2017.)

      THE COURT:  Mr. Adolf, have you heard from Mr. Moore?

      MR. ADOLF:  I have, Your Honor.  He called my office half an hour ago and said that he was stuck on 85.  Apparently there's big construction traffic.  I did manage to verify there is a big traffic jam up there.  He's coming from Winston.  When he last set it, he said his phone would get him into Charlotte right around 2:00.  One of the blue coats out there thought they saw him driving around looking for a parking space.  I expect him --

      THE COURT:  All right.

      MR. ADOLF:  -- in the door any minute now.

      THE COURT:  All right.  Well, I'll stand by for a minute.

      MR. ADOLF:  Thank you, Your Honor.  I'll -- if the Court's amenable, I'll go out --

      THE COURT:  Yes, sir.

      MR. ADOLF:  -- and look for him in the lobby.

      THE COURT:  Yes, sir.

      (Pause.)

      (Counsel and defendant entered the courtroom.)

      MR. ADOLF:  Thank you, Your Honor.

1          THE COURT: Are you ready to proceed, Mr. Adolf?

2          MR. ADOLF: Yes, Your Honor.

3          THE COURT: All right. Mr. Moore, you can be seated

4 for now.

5          Counsel, this was set on the Court's own motion

6 today and the reason was that Mr. Moore made his first

7 appearance here on the 23rd. He was released on an unsecured

8 bond with conditions that same date. He lives in

9 Winston-Salem so he was to be supervised by probation in the

10 Middle District.

11          Then on the 28th the Court heard from Ms. Fackrell

12 and she sent the following report from Michael Renigar who is

13 a United States probation officer in the Middle District in

14 Winston-Salem.

15          And what he reported is, I had scheduled Mr. Moore

16 for an appointment to meet with me tomorrow at 11:00.

17 Mr. Moore called me at 12:04 today and asked how long the

18 meeting tomorrow would last.

19          I advised him that it would last -- that it would be

20 about 20 minutes. He asked me what all he had to do. I told

21 him that we had to go over his release conditions, take a

22 photograph, and collect a urine sample.

23          He immediately interrupted me, raising his voice,

24 and said that he had already done that in Charlotte and did

25 not see why he had to do that again. He became belligerent

1  and was talking loudly.

2       I told him that we did not have to accept his case

3  and that he would have to go back to Charlotte.  When he began

4  yelling at me, I hung up on him.

5       Mr. Moore called back and I picked up.  He told me

6  that I was being god damn disrespectful to him and he had a

7  right to say whatever he wanted to.  When he began yelling at

8  me again, I once again hung up on him.

9       I called Defendant Moore and left him a message that

10  he did not need to report tomorrow.  Based upon his attitude

11  and unwillingness to cooperate, we're not willing to accept

12  him for courtesy supervision.

13       So the Court's concern was that he had been released

14  on conditions but was now not being supervised.

15       So let me ask you, Mr. Adolf, first, what did you

16  want to say about that?

17       MR. ADOLF:  A couple things, Judge.

18       First of all, I just spoke to Mr. Moore out in the

19  lobby and this has been sort of an evolving situation over the

20  last couple days.  I also talked to probation.  And he said he

21  actually called the probation officer back today to apologize

22  and try to work things out with them.  And he was told that

23  they accepted his apology and would reconsider whether they'd

24  take him.  But I'm hearing that literally in the last five

25  minutes so I'm not necessarily going to ask the Court to rely

1    on that because obviously that's something that will have to

2    be revisited if possible.

3           The way it was explained to me by the probation

4    department, because I didn't get the detail Your Honor got.  I

5    haven't seen that report, but that's consistent with what I

6    was told by the probation department verbally.  That at this

7    point there was no violation.  There was no violation being

8    filed based on that conduct.  That probation's concern --

9    again, they're here to correct me if I'm wrong -- was because

10   the Middle District does not have to accept somebody for

11   courtesy supervision.  That's at their option.  If they choose

12   not to, then the question is what is to be done and is there

13   some other way that he can be supervised.

14          And I don't know whether -- it was suggested that

15   there's a possibility that he be supervised out of our

16   district since Winston-Salem is not far; that he could report

17   to Charlotte.  Or I was thinking actually Statesville is only

18   45 minutes, I think, from Winston-Salem and that he could

19   report there.

20          I spoke to him.  He's certainly willing to do

21   whatever is necessary.  He's obviously trying to take steps to

22   be able to do whatever he needs to do to obey the Court's

23   orders.

24          As I said, my understanding is we're not here on a

25   violation hearing.  There's nothing that's been filed.

1  There's no violation of the conditions that Your Honor set out

2  that has been alleged.  So that's where we are.

3  I also -- I don't know if I need to go any further

4  than that.  If we start to get into concerns about his

5  behavior specifically, I think we need to address the

6  conditions of his bond which there was one in particular that

7  was the subject, I gather, of some dispute a week ago when he

8  was before Your Honor about whether or not he had been

9  suspended from work.  And the problem is that that condition

10  forbade him from going back to work and he had been working up

11  until that hearing before Your Honor for American Airlines, so

12  that that suddenly put him in a position of being out of a

13  job, at least temporarily while it got straightened out and

14  still has not.

15  So to the extent that we're going beyond what Your

16  Honor just said, there's certainly more that will need to be

17  said.  But if it is at this point a matter of trying to figure

18  out how to get him up with supervision and get that done

19  correctly, I think we have resources to do that.

20  THE COURT:  Mr. O'Malley.

21  MR. O'MALLEY:  Your Honor, Mr. Savage would be here

22  except for the fact he's on leave.  He asked me to cover this

23  since I was here before and I'm familiar with the facts and

24  counsel who was with the defendant when he was here before.

25  And the Court well recalls the defendant last time, despite an

1  agreement to a bond, was one word away from being held in
2  contempt of Court, direct contempt of this Court and going to
3  jail.

4  His obstructive -- as we looked into it after being
5  notified of the sua sponte hearing, in talking to the
6  probation officers, that his obstructive attitude toward court
7  personnel has continued up until today except for he called
8  with an apology. But to our knowledge, nobody said, yeah, you
9  can come back to the Middle District.

10  So I talked to a couple probation officers. I asked
11  Debbie to check with them as well. We're prepared to offer
12  testimony today so the Court can hear this firsthand because
13  the government's position is that his obstructive conduct with
14  respect to complying without being combative with the terms
15  and conditions does constitute a violation of his supervised
16  release, and so we'd ask for a hearing to reconsider his bond
17  situation under 18 U.S.C. 3148(a).

18  Secondly, we contend that the nature of his
19  obstructive conduct to the Court personnel coupled with newly
20  discovered facts about his contact with law enforcement post
21  offense and prior to federal court last week where he
22  threatened to kill officers, telling them that he should have
23  killed them and shot them, we think the Court needs to make
24  this -- hear this information so the Court can make a
25  determination, as the government argued, that the defendant

1  should be detained under 18 U.S.C. 3142(d)(2)(B) as a serious

2  risk that he will obstruct or attempt to obstruct justice, or

3  threaten, injure or intimidate, or attempt to threaten, injure

4  or intimidate a prospective witness.  He's attempted to

5  obstruct and threaten just to court personnel.  So who knows

6  what's going to happen.  We just think there's enough of a

7  threat here, and the defendant has exhibited that not only in

8  the courtroom, but repeatedly until his apology -- the only

9  reason he called and apologized yesterday was because the

10  Court set this for a hearing.  And it's a pattern of conduct

11  that is just -- it is unheard of, quite frankly.

12        So we'd like to put that on.  We'd like to make that

13  oral motion to revoke his bond, have the Court reconsider

14  detention, and then detain him on the grounds that we -- that

15  I just announced.  I have the witnesses available to do that,

16  including the officer whose life he threatened after the fact.

17        MR. ADOLF:  A couple responses to that, Judge.

18        First of all, as I said before, we are not here on a

19  bond revocation hearing and that's because -- Mr. O'Malley

20  quotes 3148(a).  He doesn't mention 3148(b) which says --

21  begins, "The attorney for the government may initiate a

22  proceeding for revocation of an order of release by filing a

23  motion with the district court."

24        So it has to be in writing.  There's no such thing

25  as an oral filing with the district court.  So that is why

1  every other bond revocation Your Honor has ever seen involves

2  written allegations.  It involves setting a court date and

3  allowing the parties to brief whatever is necessary, prepare

4  whatever is necessary, exchange whatever discovery is

5  necessary.  So we are not here on that.

6        If the government at some point chooses to actually

7  substantiate this as being a bond violation, which, again,

8  probation told me the opposite, that they're not pursuing this

9  as a bond violation, but rather a supervision issue that the

10 Court needs to address as far as how he's physically going to

11 be supervised.

12        But if indeed the government is alleging that his

13 behavior has been extraordinary, I think the government's

14 behavior has been extraordinary.  And I think that -- it might

15 be that part of the reason Your Honor saw the fact that he is

16 reacting the way he is is -- I'm at a bit of a disadvantage

17 because I wasn't at the hearing a week ago so I don't know

18 exactly what representations the government made word for

19 word.

20        But my understanding was that the whole reason that

21 Mr. Moore was so upset and angry was because the government

22 was asking the Court to bar him from all American Airlines',

23 property which is his employer, therefore ending his ability

24 to work at American Airlines.  And the government's response

25 as it was related to me was that he's already been suspended

1    and that he will be shortly terminated.  And I believe that it
2    was Mr. O'Malley who was representing the government at that
3    hearing.

4           That is not true as it turns out.  It wasn't true at
5    the time.  And the government's own information that they sent
6    me this morning confirms that.  Because Mr. Moore insisted,
7    apparently it's true, that ever since this incident many
8    months ago at this point, he has continued to work for
9    American Airlines.

10          And to be clear, what he's working at is a call
11   center.  It's a hundred miles from the airport.  It's just in
12   a normal office building in Winston-Salem.  And he's -- it's
13   working on phones.  And he's been working there for three
14   years.  And when it was represented to the Court that he'd
15   been suspended, he, of course, told me that that couldn't be
16   the case because he had been working there that entire week
17   and the months before.

18          And so what I did was I got in touch with the
19   president of the local -- of the Communications Workers of
20   America who represents the unit that he works in, a woman
21   named Vicki Hoots who's up in Winston-Salem, to try to clarify
22   what was going on.  She -- I asked her to speak to management,
23   try to get to the bottom of what his situation is because it's
24   one of two things.  Clearly now he's suspended.  He can't go
25   to work.

1        And what I was trying to figure out is, is the

2   suspension because he's been charged in this matter and

3   because of the allegations, or was he still working in spite

4   of the allegations and he was suspended because he is

5   court-ordered not to go to that building which obviously makes

6   him unable to work.  Sort of a chicken and egg problem.  So I

7   asked her to clarify that with management and get back to me

8   in writing in some fashion.

9        I'd like to hand up to the Court a letter I received

10  from her yesterday --

11              THE COURT:  You may.

12              MR. ADOLF:  -- if I could.  I've provided it to the

13  government.

14              (Pause.)

15              THE COURT:  All right.

16              MR. ADOLF:  And Judge, the government just this

17  morning sent me a letter apparently from a customer service

18  manager at American Airlines that as represented to me was

19  going to confirm that Mr. Moore was already suspended at the

20  time of the hearing a week ago; and in fact, confirms the

21  opposite.  I received this from the government and I guess I

22  will hand up my copy to the Court.

23       But the letter confirms that the first discussion

24  with Mr. Moore that he was being suspended was the night

25  following the hearing.  The hearing was June 23rd.  He was

 1  first spoken to on Friday night after the hearing and told at
 2  that point that he was being suspended.  And then that was
 3  followed up with notice in writing on Monday, this Monday,
 4  that he was suspended and making clear that it was because he
 5  could not come to work because they had been told he was under
 6  court order not to set foot on American Airlines' property.

 7          So what Mr. Moore was dealing with a week ago was
 8  the government misrepresenting his employment status in a way
 9  that he believed was costing him his job.  And I -- I think
10  for anybody, even for those of us who work here, much less a
11  citizen who's never been in federal court before, to hear a
12  government lawyer stand up and tell something that you know
13  isn't true that may cost him his job would be extremely
14  upsetting.

15          And I think it's important to look at this in that
16  context.  That for the last week he has been trying to
17  scramble around, speak to his union representative, speak to
18  his manager, make appointments, go back -- go over to
19  probation and deal with the requirements there, all under the
20  threat -- and not going to work every day, all because he
21  believes that the government is telling lies about him.

22          And I have no doubt that Mr. O'Malley made those
23  statements in good faith.  I'm sure they were relayed to him
24  by somebody else, but we don't know who.  And it certainly --
25  that's not something that we can blame Mr. Moore for not

1  understanding the way that sometimes in the game of telephone
2  these things get messed up, and in this case messed up in a
3  way that it potentially from his perspective cost him his job.

4          And I think it's important to recognize that not
5  just for going forward, but also because, honestly, he came in
6  here first seeing these charges, kind of shocked and stunned
7  and upset that we were in federal court over this.  And again,
8  from my perspective doing these cases every day and reading
9  the indictment, when I first got it I was a little shocked and
10 stunned too.

11         These charges read more like a press release and
12 less like actual charges.  It's a six-page speaking indictment
13 that he faces that charges two counts of what amounts to
14 simple assault, one of which doesn't even allege that he
15 touched anybody or tried to.  It's, again, nasty words,
16 cursing at a TSA agent.  But what it is not is an assault and
17 it's charged as an assault by words, which frankly I've never
18 seen in federal court.

19         I did a little research on the statute.  I was
20 unable to find any case where anyone didn't actually
21 physically hit a TSA agent in a serious way or try to strangle
22 them.  That's what the cases are.

23         And so the first count of the government's
24 indictment, I think, is seriously weak.  May not survive a
25 Rule 29.  And it's certainly something a jury would have

1  serious questions about.

2          And then there's a second count and the second count

3  is an assault which is a resisting arrest.  Again, in a

4  six-page speaking indictment that likes to say lots of bad

5  things about Mr. Moore, leaves out exactly what it was he did

6  other than to say that technically it was an assault using his

7  body, which I gather means that five officers were tackling

8  him and he did not go limp.

9          And that charge has even more serious problems than

10 the first charge because, again, I did a little research.

11 This is a statute I haven't seen before.  An interesting

12 statute under Title 49 about security screening personnel.

13 And it is specific to federal employees or employees of the

14 airport or the airline who have security duties.  Both of

15 those are elements of the offense.

16         These are CMPD officers who just patrol the airport.

17 And I was -- I tried to do a little research to figure out if

18 a local police officer who's simply at the airport is

19 considered an airport employee.  That has never been fully

20 litigated.  But I did find an unpublished case out of a

21 different circuit where the government conceded that the

22 proof -- that that particular local police officer was working

23 security duties or helping with security at the airport, that

24 they had not proven that, that that was insufficient or they

25 did not rely on that.  In that case it didn't go anywhere

1  because the defense had failed to raise it and therefore
2  waived the issue, but the government did concede that.
3         So there is serious problems with both of these
4  counts and so from Mr. Moore's perspective coming in, he's
5  wondering with all this -- these pages of language making him
6  look like a bad person, charges that look pretty thin to be in
7  federal court, and then comes in and the next thing he hears
8  is the government lawyer telling lies about him to try to get
9  him to lose his job.  It is enough to make one
10 conspiratorially minded if one has not been in the system for
11 a while.  Understand that mistakes are made.
12        So at this point, Judge, as I said, we do not have a
13 bond violation before us.  My understanding is probation is
14 not pursuing it.  The government has not followed the
15 procedures required for a bond revocation.
16        And as for his conduct and his ability to be
17 supervised, I have no doubt given what he's seen and the
18 changed posture of the case now that I'm on it and we've seen
19 a little bit of what the government is doing and established
20 the fact that contrary to what was said, it seems that he can
21 go back to work, I think that the Court should give the
22 probation office the leeway to either supervise him out of
23 Charlotte or Winston-Salem or Statesville while that gets
24 worked out.  If indeed he does violate conditions of bond,
25 then appropriate papers on that can be filed.

1         And look, Judge, Your Honor has seen the letters
2 that we have now from both American Airlines itself and from
3 his union president and it sounds like he can get his job back
4 if the Court allows that.  If we're wrong, they don't have to
5 hire him -- keep him.  They don't have to allow him back on
6 the premises if they don't want to.

7         All I'm asking the Court for is to leave that up to
8 American Airlines, which they were fully informed of the
9 charges against him when he was first arrested.  They were
10 fully informed of the charges as they went forward in state
11 court and that was in March and here we are almost in July and
12 I don't think that there's been any significant change.  The
13 charges are what they are, but they don't amount to much
14 (inaudible).

15         I believe that he has every right to believe that he
16 will be vindicated when this all shakes out.  And now that he
17 knows that there is advocacy on his behalf and that these
18 matters can be straightened out in the details and that he
19 will likely be allowed to go back to work and resume what he
20 was doing until this is resolved, I don't think there's any
21 need to do anything else and I don't think the Court at this
22 point has any matter before it that calls for the Court to do
23 anything.  So that's what I would ask for.

24         THE COURT:  Well, when he is given a bond by the
25 Court and released on conditions and he lives in another

1  district and then he has to be supervised in that district and

2  their response is to say we're unwilling to supervise him, I

3  think the Court has to do something because there is somebody

4  who's been released on a bond with conditions and they're not

5  being supervised.  So I don't think it will be appropriate for

6  the Court not to act in those circumstances.

7        MR. ADOLF:  I understand, Judge.  I think that just

8  because of the geography, as it happens there is one probation

9  office, as I said, that's within 45 minutes of his -- of his

10  residence which, frankly, there are plenty of people in this

11  district who live a lot farther than that from any probation

12  office and have to be supervised at great distance.  I would

13  certainly ask the Court to inquire of probation whether

14  logistically that's possible to do, about whether the

15  Statesville office can do that.

16        And beyond that, Judge, I do think that it may be

17  that the decision about supervising him in the Middle District

18  could be reconsidered and I'd ask the Court for time to pursue

19  that.

20        But I think that at this point, given that there is

21  no violation filed and the misunderstandings if we say -- if I

22  can put them that way that have gotten us here, I do think

23  that with probation having a little bit of flexibility from

24  the Court, I think this is something that can be worked out

25  where he's being treated within the normal parameters of how

1    people are supervised, whether it be technically out of the
2    Statesville office or Winston-Salem or the Charlotte office,
3    so...

4           THE COURT:  Mr. O'Malley, what's -- what's your
5    response to Mr. Adolf saying that the Court can't act without
6    a violation order?

7           MR. O'MALLEY:  Well, first of all, it's a rule of
8    basic statutory construction that may is permissive and shall
9    is mandatory.

10          3148(b) reads, The attorney for the government may,
11   doesn't say shall, it says may initiate a proceeding for
12   revocation of an order of release by filing a motion with the
13   district court.

14          So had the Court not on its own set a motion because
15   of the defendant's conduct while on supervised -- on pretrial
16   release, we wouldn't be here.  We would have filed that motion
17   in writing because the next step is the judicial officer may,
18   not shall, but once again the permissive, as everybody who's
19   been trained to be a lawyer and passes the bar exam knows,
20   shall is mandatory and may is discretionary, may issue a
21   warrant for the arrest.

22          So the warrant would be -- would be -- there was no
23   warrant here.  The Court issued a summons.  The defendant is
24   here.  So there's nothing procedurally that prohibits us from
25   moving now orally.

1          Secondly, we considered the defendant's -- I've been
2     doing this 36 years, 31 with the feds, 6 with the state.  Your
3     Honor has been both a lawyer and a judge and your experience
4     is probably similar to mine.  We've probably seen thousands of
5     people in the courtroom.  But I can count on one hand the type
6     of behavior I saw in this courtroom where he was one word away
7     from Your Honor sending him to jail.  I can count on one hand
8     the type of attitude and threats he made to the probation
9     officer that disrespect the language that not -- that started
10    with this whole TSA incident and has continued even past his
11    initial appearance.

12          I feel it's an obligation of the government when we
13    feel the probation officers that are going to supervise him
14    are at a risk of threat, as are the witnesses at the time we
15    come to trial.

16          So I'm making a proper motion.  I have a valid
17    basis.  I'm ready to put on evidence.  If Mr. Adolf wants to
18    call them back as he thinks he's not prepared to cross examine
19    them, we'll ask them to come back next week.  But at the very
20    least I'm prepared to put on a case and I think Your Honor
21    before making any decision needs to know the kinds of threats
22    he made to a police officer unrelated to this case whatsoever
23    about killing police officers.

24          MR. ADOLF:  If I may, while we're getting into a
25    statutory interpretation, the "may" refers to the government's

decision whether to file a violation or not.  It doesn't refer to how they file the violation.  Saying that they may file a violation by filing a motion with the district court doesn't mean they can do it by paper airplane or that they can do it by telegraph.  It specifies the way to do it.

The "may" means that if there is a violation, the government has discretion to either file for it or not and that the judicial officer has the discretion to issue a warrant.  It's just an empowering phrase.  Clearly does not say anything about alternative procedures such as oral.  Any motion can generally be made orally and in writing.  This specifies the method by which it is.

For me to read the statute the way the government reads it is to read that entirely out of the statute.  And we know that statutes must be read so that every word has meaning.  The meaning there is that the government has discretion whether to file or not.  It does not have discretion as to whether that must be by filing a motion with the district court.

So again, I don't think it's appropriate for us to be dealing with the -- to be dealing with any kind of violation at this point.  And as I said, the probation department at last I heard from them was not pursuing this as a violation, but rather as a clarification in how to deal with this.

1          Judge, I always hesitate to try to proffer evidence

2   not knowing what it is, but Mr. Moore tells me that the Middle

3   District actually left a voicemail today on his phone saying

4   that they were willing to supervise him.  His phone is locked

5   up down at the front of the courthouse.  I would ask for an

6   opportunity to bring the cell phone in so I can talk to him

7   with it and he can punch whatever codes he needs so we can

8   hear that and perhaps present it to the Court if necessary.

9          THE COURT:  What I want to hear at this point is

10  from probation.

11         And Ms. Fackrell, why don't you come up and be

12  sworn.

13         DEBORAH FACKRELL, GOVERNMENT WITNESS, SWORN,

14         THE COURT:  I've read that email that you sent from

15  the probation officer in Winston-Salem.  Do you have anything

16  to add to that?

17         THE WITNESS:  Yesterday I got an email from Mike

18  Savage with the U.S. Attorney's Office requesting that

19  Mr. Renigar come to this hearing.  So I forwarded the email to

20  him and said, Michael, can you come to the hearing tomorrow at

21  2:00.  Did not hear back from him.

22         So today in preparation for the hearing I emailed

23  his supervisor, Ed Cameron, and said I never heard from

24  Michael; is he going to come?  And he said that they were in

25  training and that Michael Renigar had not, you know, talked to

1   him about coming to the hearing.

2              So I called Officer Renigar on his cell phone and

3   said I'm on my way to court; is there anything that you want

4   to add?  And he said -- he rehashed the conversation between

5   the defendant and himself.

6              He also advised me that they had alerted the CSOs

7   not to let the defendant in their building; that they were not

8   going to supervise him.  And that -- I believe this happened

9   on Wednesday.

10             On Thursday Officer Renigar got an email from his

11  supervisor, Ed Cameron, that said, Hey, Michael, you're not

12  alone.  He called me last night and dropped a couple MFs on

13  me.

14             Michael said when I was speaking to him on the

15  phone -- Officer Renigar said that he received a voicemail

16  from the defendant apologizing and he received that

17  voicemail -- I believe he said it was this morning that he

18  received the voicemail.  He's not in the office so I don't

19  know when it came in.  And he said that the defendant said

20  that he was sorry, he did not mean to be be disrespectful.  He

21  received that this morning.

22             THE COURT:  And are you aware that anything has

23  changed as far as their position as to whether or not they're

24  willing to supervise him?

25             THE WITNESS:  When I talked to Officer Renigar today

1  at quarter of 2:00, they were not willing to supervise him.

2          THE COURT:  Do you want to ask her anything

3  Mr. O'Malley?

4          MR. O'MALLEY:  Yes, Your Honor please.

5          First of all, I'd let the Court know, as with

6  Ms. Fackrell we had PO Renigar on the phone, speaker phone, so

7  she heard him when I asked some questions on that.  But I'd

8  also alert the Court that I told him to be on standby so that

9  we could call him from the court so Your Honor could talk to

10  him directly and to be cross examined.  If Your Honor doesn't

11  want to do that, I would ask questions based on what I heard

12  him tell Ms. Fackrell.

13          THE COURT:  You may inquire of her.

14          MR. O'MALLEY:  Okay.

15                  DIRECT EXAMINATION

16  BY MR. O'MALLEY:

17  Q.  So while preparing I asked you to email him and give me

18  his cell number so we could call him, correct?

19  A.  Correct.

20  Q.  And you were out here and we put him on speaker phone,

21  correct?

22  A.  Yes, sir.

23          MR. ADOLF:  Your Honor, this is a sitting

24  jurisdiction.  I think that the  prosecutor is supposed to be

25  sitting at this point.

1      MR. O'MALLEY:  Oh, be happy to.

2          THE COURT:  I'll instruct him, Mr. Adolf, if I think

3  he's acting in such a way that I need to instruct him.

4          MR. ADOLF:  Thank you.

5  BY MR. O'MALLEY:

6  Q.   So on the telephone call, what did he tell you first of

7  all about whether or not the defendant on his own should have

8  reported versus the statement the probation officer made to

9  him that it was his obligation as set forth in writing in the

10  bond papers?

11  A.   Officer Renigar said that he was notified by his

12  supervisor of this case that was being requested courtesy

13  supervision from our district to the Middle District, and that

14  he had been told that Mr. Moore was instructed to contact

15  their office by noon on Monday, which would have been the

16  26th.

17      He had not heard from from Mr. Moore so he called him

18  himself and said, You were supposed to call me.  Why didn't

19  you call?

20      He said he didn't know that he was supposed to call.

21      Mr. -- Officer Renigar said that he told the defendant, I

22  have a signed document from you stating that you understand

23  that you were supposed to contact my office.

24      At that time they set an appointment for Thursday, which

25  would be the 28th -- 29th, excuse me.

1    And so the next day he received a call from Mr. Moore,
2 which is when all this happened that was in the email that he
3 sent.
4 Q.   Okay.  And that's the one that Judge Cayer just read into
5 the record?
6 A.   Yes, sir.
7 Q.   The initial appearance hearing, correct?
8 A.   Yes, sir.
9 Q.   All right.  Did the probation officer tell you whether or
10 not he thought the defendant was a ticking time bomb?
11 A.   Those were his words.
12         MR. O'MALLEY:  I have no other questions, Your
13 Honor.
14         THE COURT:  Mr. Adolf.
15         MR. ADOLF:  Yes, just briefly.
16                 CROSS EXAMINATION
17 BY MR. ADOLF:
18 Q.   Ms. Fackrell, you said -- you talked about speaking to
19 Mr. Renigar about the conversation on Tuesday and that that
20 was when they were talking about how long it was going to take
21 and when their -- when it was -- when their face-to-face
22 meeting was actually scheduled for?
23 A.   I believe that conversation was actually on Wednesday,
24 the 28th.  That's the day that Officer Renigar called me about
25 this.  So I believe the way the email reads, Mr. Moore called

1  me today at 12:04 today, and his email is dated 6/28.  So that
2  would be Wednesday.
3  Q.   So you said earlier about a conversation where Mr. Moore
4  was asking -- or there was a conversation between Mr. Moore
5  and Mr. Renigar about when he was going to report, how long
6  the meeting would take, what he would have to do and so forth.
7  A.   Yes, sir.
8  Q.   And the conversation about that appointment was on
9  Tuesday or Wednesday?  I'm trying to follow.
10  A.   I believe it was on Wednesday.
11  Q.   Okay.  After the Tuesday problem we talked about.
12  A.   No, sir.  Mr. -- Officer Renigar contacted Mr. Moore when
13  he failed to call the office as instructed.  So Officer
14  Renigar had to contact him himself.
15      He asked Mr. Moore, Why didn't you contact the office?
16      He said he wasn't aware that he had to.
17      At that time Mr. -- Officer Renigar set an appointment
18  for Thursday, the 29th, for Mr. Moore to come to the office.
19      Apparently Mr. Moore -- and I'm saying this because I was
20  notified on Wednesday, the 28th, Mr. Moore called that -- the
21  office on Wednesday to ask how long he was going to be there,
22  what he was going to be doing there, et cetera.
23  Q.   So in that Wednesday conversation with Mr. Renigar, did
24  he mention anything about Mr. Moore's concern that that
25  appointment might interfere with the meeting he had with his

1  union that same day where he was trying to deal with

2  straightening out whether he was going to be allowed to get

3  back to work?

4  A.  No, sir.

5  Q.  You said something about talking to Mr. Renigar earlier

6  this morning.  Have you talked to Mr. Cameron today?

7  A.  Only by email.

8  Q.  And when was that email?

9  A.  Around noon.

10         MR. ADOLF:  Nothing further, Your Honor.  Thank you.

11         THE COURT:  All right.  You may step down,

12  Ms. Fackrell.

13         (Witness stepped down.)

14         THE COURT:  Counsel, what I'm trying to focus on is

15  the Court's order setting conditions of release and whether he

16  is amenable to conditions of release or not.  That's what I'm

17  trying to focus on.  I'm really not at this point wanting to

18  get into the underlying facts of his case and what the

19  allegations are.

20         I want to hear from Mr. Baker also, Mr. O'Malley.

21         Mr. Baker, come up and be sworn.

22         ROSS BAKER, GOVERNMENT WITNESS, SWORN,

23         THE COURT:  Mr. Baker, I think you were here on the

24  23rd when the defendant made his initial appearance and you

25  had contact with him then.

1     THE WITNESS:  Correct, Your Honor.

2     THE COURT:  Let me hear from you what happened at

3 that meeting.

4     THE WITNESS:  Well, briefly, at the end of his

5 hearing I approached him with our typical paperwork that we

6 give folks that are let out on bond.  Informed him that he

7 would need to report to our office that day.  I asked him --

8 and I wasn't aware at the time when I asked Officer Johnson to

9 come over and help that day because we had several initial

10 appearances, and I wasn't aware that he had actually

11 interviewed Mr. Moore in the back.

12     But I asked Mr. Moore to wait outside after the

13 marshals released him so I could speak with him.  I had

14 another guy in front of him that I needed to interview.

15     At that point in time, they did release him after

16 court was over.  I was interviewing the other guy.  He got

17 very upset and demonstrative.  He just stormed off.  He said,

18 I don't have time for this.  I've already talked to enough

19 people, and he left.

20     I said, Okay.  I was in the process of interviewing

21 somebody else, like I said.

22     Shortly after that the CSOs came to me and were

23 asking if I needed to talk to the guy.

24     And I said, Well, at that point in time I thought I

25 had to, but I explained to them that I was obviously busy with

1  somebody else.

2          And they said, Well, he's, you know -- I don't

3  remember the exact verbiage they used.  He was obviously being

4  difficult with them and then he left.

5          I finished my interview with the other gentleman.  I

6  went back to our office.  And by the time I got back to the

7  office -- and they had already -- because we're required to

8  let them know here in court if somebody is going to be

9  released and I sent something to Ms. Fackrell to let her know

10 so we can get the case assigned to an officer.

11         But I came back to the office and I asked them if he

12 had -- Mr. Moore had shown up yet.  They said no.

13         At that point in time I think he had tried to call

14 our office and the officer who was our duty officer at the

15 time, Ms. Downs, was there and evidently they had had some

16 issue with him already on the phone.  I wasn't privy to that

17 phone conversation so I can't specify what all that entailed.

18         And that was the -- that was the end of my

19 involvement with him that day and I haven't obviously spoken

20 with him or anything since that time.

21         I did -- I was required to complete his report.  One

22 of the things that he had -- they asked -- or he had asked was

23 that nobody in his family were to be contacted, which was

24 fine.  And I tried to substantiate information he had given

25 Mr. Johnson in the report through I think a friend of his and

1  I wasn't able to get ahold of that gentleman.  But that was it
2  in terms of my involvement.
3           THE COURT:  Mr. O'Malley.
4           MR. O'MALLEY:  Just a few questions.
5                    DIRECT EXAMINATION
6  BY MR. O'MALLEY:
7  Q.   So when you saw the defendant talking with the CSOs out
8  front, the Court security officers who counsel called the blue
9  coats, did you see him standing talking to them?  Did you
10 overhear what he was talking to them about?
11 A.   No, I was actually right back there in the hallway.  I
12 did not physically see him.  They came to me and told me that
13 they were having an issue with him and asked if I needed to
14 see him.  And I explained to them kind of the process I was
15 in.  But I didn't physically see him have any physical or
16 verbal issue with them.
17 Q.   Did they tell you that he was telling them that he was
18 expecting the FBI to give him a ride back home to Winston?
19 A.   There was conversation about that, that he was upset
20 because he was -- and he -- again, he didn't say this directly
21 to me.  But he was told they were going to give him a ride
22 back, and that was -- that was the extent of that.
23 Q.   So did you or did you not try to talk to him again when
24 you saw him in the lobby after he was with the CSOs?  Did you
25 approach him and try to talk to him at all?

1   A.   No, I did not at that point in time.

2   Q.   All right.  And at any point in time -- you learned that

3   he called and spoke to the duty officer.  That was Melissa?

4   A.   Correct.

5   Q.   And do you know whether or not he showed up that day and

6   spoke to anybody?

7   A.   It's my understanding he did show up.  I had to leave

8   because I had a personal matter to take care of.

9   Q.   So Cliff Johnson who's here in court can talk to that,

10  right?

11  A.   Correct, he was there too.

12          MR. O'MALLEY:  Thank you.

13          That would be my next witness I think Your Honor

14  would want to hear from.

15          THE COURT:  Mr. Adolf.

16          MR. ADOLF:  Thank you, Your Honor.

17                      CROSS EXAMINATION

18  BY MR. ADOLF:

19  Q.   Mr. Baker, were you in court for the initial appearance?

20  A.   Correct.

21  Q.   So you were here when you heard Mr. O'Malley say that

22  Mr. Moore had been suspended from his job and was likely to be

23  terminated?

24  A.   I remember something to that effect, yeah.

25  Q.   And what you heard today is that actually was not true.

1  A.    Just from what I've heard.

2  Q.    And as far as you're aware, that was certainly the first

3  time that Mr. Moore had heard that there was some problem with

4  him remaining at his job, right?

5  A.    I can't speak to that.  I'm not sure when he would or

6  wouldn't have heard.

7  Q.    Now, you said that -- you -- you described him then

8  going -- calling the office and -- you said -- you told us

9  that right after the hearing of what you had heard from court

10  security was him saying that he had been expecting to be taken

11  back to Greensboro.

12  A.    He had mentioned something about that to them, yeah.

13  Q.    Right.  And -- now this was his initial appearance on

14  this charge, right?

15  A.    Correct.

16  Q.    As far as you're aware, he had no warning that he had

17  been charged in federal court and he was just arrested in the

18  this other district without any warning to him by federal

19  officials, right?

20  A.    As far as I know.

21  Q.    And then driven whatever it was, an hour, hour and a half

22  here to Charlotte.

23  A.    Right.

24  Q.    And what he was telling people was that he had been told,

25  because obviously he was upset at discovering that this case

1   had been charged in federal court, that it wouldn't be a
2   problem.  He wouldn't be stranded in Charlotte because they
3   took him here and they would take him back.
4   A.   Okay.  I'm not aware of that, but, yeah, okay.
5   Q.   Well, based on what the court security officers told you,
6   that's what it sounds like he was thinking.  Fair to say?
7   A.   Fair.
8   Q.   Now, you told us that he did indeed call the office and
9   ended up reporting to your office.  You talked a little bit
10  about what went on there, right?
11  A.   Well, now, I wasn't at the office when he reported.  Just
12  when -- evidently the paper I had given has our phone
13  information so I didn't speak to him any further obviously
14  after court when he left.  But he contacted the office.  And
15  from what I remember, he was somewhere around where the public
16  library is downtown.  They were trying to literally get him
17  back to our office and direct him back, but I wasn't there
18  when he showed up.
19  Q.   So he was lost in Charlotte somewhere.
20  A.   From what I understand, yeah, he was somewhere on College
21  Street, yeah.
22  Q.   Trying to find his way to the probation office as
23  directed, right?
24  A.   Right.
25  Q.   Now, after he reported to the probation office and went

1  through the paperwork and all that, he then left.  This was on

2  Friday.

3  A.   I can't speak to that.  I wasn't there.

4  Q.   And you actually in preparation for this hearing, you --

5  you prepared a pretrial report for him, right?

6  A.   Yes.  I mean, even though he was let out on bond, we're

7  still required to complete a report.

8  Q.   Right.  And that report was updated with all the

9  information you had as of, I guess it was Wednesday when

10  you --

11  A.   Correct.  Criminal history, yeah.

12  Q.   And your recommendation, approved by your supervisor, was

13  for bond.

14  A.   Right.  The bond -- yeah, correct.

15          MR. ADOLF:  Nothing further, Your Honor.

16          THE COURT:  You may step down, Mr. Baker.

17          (Witness stepped down.)

18          THE COURT:  Now, you wanted me to hear from

19  Mr. Johnson?

20          MR. O'MALLEY:  Yes, please, Your Honor.

21          CLIFF JOHNSON, GOVERNMENT WITNESS, SWORN,

22                  DIRECT EXAMINATION

23  BY MR. O'MALLEY:

24  Q.   Mr. Johnson, were you working at the the probation office

25  on the day the defendant was supposed to report directly after

1  court?

2  A.    That is correct.

3  Q.    And how -- did you encounter the defendant?

4  A.    I did.

5  Q.    Tell us how that came about.

6  A.    I encountered the defendant when Ross Baker, Officer

7  Baker, asked -- stated that he needed help doing interviews.

8  And I was the one that conducted the interview, the pretrial

9  interview of the defendant.

10  Q.    Now, before you conducted it -- now, when you say you

11  conducted the interview, you conducted the interview because

12  he showed up, correct?

13  A.    Well, yeah, he was in custody during the time.  He was in

14  the marshal's holding cell when I conducted my interview.

15  Q.    Oh, you're talking about here?

16  A.    Right.

17  Q.    Okay.  I'm talking about after court when he was released

18  from custody and he was supposed to go back, were you in the

19  office then?

20  A.    Yes, I was.

21  Q.    That's the time period I'm talking about.

22  A.    Okay.  Yes, I was returning from lunch.

23  Q.    So tell us what happened.

24  A.    Okay.  Returning from lunch.  Officer Downs was on the

25  phone with --

1    Q.    That's Melissa Downs?

2    A.    Melissa Downs was on the phone with the defendant.  And I

3    couldn't hear his side of the conversation, but I could tell

4    that she was extremely frustrated in trying to get him to

5    report to the office.

6    Q.    What could you hear her saying and did you talk to her

7    about it?

8    A.    Well I talked to her -- I spoke to her a little bit about

9    it.  But she was just frustrated, saying he's not -- seems

10   like he's not comprehending the fact that he needs to report

11   to the office.

12   Q.    So it wasn't a question about being lost in the City of

13   Charlotte.  It's he was challenging whether or not he had to

14   appear as directed here in court to the probation office.

15   A.    That's correct.  That's correct.  That's my

16   understanding.

17   Q.    So what did she tell him that made him finally show up in

18   court -- or show up at the probation office?

19   A.    In so many words she stated if you don't show up here,

20   then we'll be processing a warrant --

21   Q.    Okay.

22   A.    -- for your arrest.

23   Q.    Okay.  So he was threatened with arrest not because he

24   was lost, but he ended up showing up.

25   A.    That is correct.

1  Q.   And Mr. Baker was gone and so you filled in, correct?

2  A.   Right.  That's correct.

3  Q.   So just describe your encounter with him and if you'll

4  address with him the way he was addressing Melissa Downs with

5  respect to even showing up to interview.

6  A.   When he reported to the office, I was asked by the

7  receptionist to go out there and speak with him before Officer

8  Downs wanted to go speak with him.  When I went out there, he

9  was frustrated because he -- well, he kept stating that the

10 officers were supposed to take him home from the hearing, from

11 the detention hearing.

12 Q.   Let me stop you a second.  How long have you been a

13 probation officer?

14 A.   For 22 -- going on 22 years.

15 Q.   And how many federal law enforcement agencies do you know

16 transport defendants who appear in court represented by

17 counsel back to the place of arrest?

18 A.   None.  None.

19 Q.   Okay.

20 A.   But at the same time, yes, he was frustrated because they

21 were supposed to give him a ride home.  He didn't have any ID.

22 He didn't have any money.  And that was pretty much the sense

23 of the conversation.

24 Q.   But he had a mom, right, he could have called?

25 A.   Well, he had a mom; but at the time, of course, he did

1 not want his mom -- from our prior conversation, he didn't

2 want his mom to know about the actual case.  He wasn't ready

3 to tell them.

4 Q.   That was his choice.

5 A.   That was his choice, that's correct.

6 Q.   Go ahead.

7 A.   And from that point for -- from my experience and -- my

8 experience with him, he was not -- he didn't give me any type

9 of problems or any issues at the time that I was speaking with

10 him.

11 Q.   Did you tell him -- give him any instructions on how he

12 needed to comply that calmed him down from the way you first

13 encountered him?

14 A.   Sure.  Sure.  Most definitely.

15      I just told him that it would be a difficult ride under

16 supervision if he wasn't able to control his anger problems or

17 anger issues he might have.

18 Q.   And what did you tell him about what, if anything, the

19 Charlotte office would do to attempt to accommodate his

20 reporting requirements in the Middle District of North

21 Carolina versus coming back to Charlotte once a month?

22 A.   Well, I pretty much told him that he would need to comply

23 with whatever the conditions were that the judge issued and to

24 make sure that he was able to get along with the officer and

25 any other staff from the court that was trying to help him get

1    to the Middle District.

2         And I stayed there to pretty much assist him getting a

3    ride back through his mom.  He eventually called his mother

4    and assisted him to get a ride back to the Middle District

5    with his mother.

6    Q.   And when you told him that you were going to reach out to

7    the Middle District -- your office was going to reach out to

8    the Middle District to accommodate him by reporting there

9    versus here, did he ever tell you that he didn't have to do

10   that or he didn't want to do that or he wasn't going to submit

11   another sample?  Did he --

12   A.   No, he did not give me any issues whatsoever.  He

13   complied with the drug test as well.  So I didn't have any

14   issues with him while here --

15   Q.   Right.

16   A.   -- that's correct.  And again --

17   Q.   But my question to you is, did he ever challenge back,

18   well, now that I've done this, will I have to do it again when

19   I show up to the other office?

20   A.   No.  He was just questioning why.  Why do I have to do

21   this, why do I have to do that?  And I explained to him why he

22   had to -- why he had to obey the orders of the court.

23              MR. O'MALLEY:  Thank you.

24              No other questions, Your Honor.

25              THE COURT:  Mr. Adolf.

1          MR. ADOLF:  No questions, Your Honor.

2          THE COURT:  You may step down, Mr. Johnson.

3          (Witness stepped down.)

4          THE COURT:  Mr. O'Malley, when you made reference to

5    something about a police officer being threatened, was that

6    something that happened as part of the underlying offense or

7    was that something that happened --

8          MR. O'MALLEY:  It happened after the offense with

9    respect to TSA at the airport.  It happened before court when

10   Your Honor released him.  It was just a separate encounter

11   with law enforcement regarding a traffic offense and

12   defendant's obstructive conduct and later resisting arrest and

13   making threats to the officer.  So it would go to the

14   dangerousness if Your Honor was considering -- reconsidering

15   bond and detaining him.  It does not -- it's not involved

16   between the time he came to court here and today with respect

17   to his encounters with the probation officers.

18         MR. ADOLF:  I'm sure Mr. O'Malley does not mean to

19   leave out important facts, but I would just say this, Judge.

20   And I don't think we need to go down this road, but the

21   incident that we're talking about is two days after the

22   underlying offense in this case.  The underlying offense in

23   this case was March 30th.  The incident the government is

24   talking about is April 1st.  We're now almost in July.

25         So, you know, if the government wants to get that in

1   as 404(b) at trial because it was close enough in time to the
2   original offense, that might present an interesting issue.
3   Whether that bears on having dealt with similar behavior in a
4   48-hour period three months ago has nothing to do with bond
5   here today.
6          THE COURT:  So you're saying it has no relevance to
7   his conditions of release?
8          MR. ADOLF:  Judge, he is charged in the indictment
9   with obstreperous and angry behavior.  The government calls it
10  assaultive.  I would say maybe bordering on assaultive.  It's
11  certainly unkind and angry on March 30th.
12         The fact that he displayed similar behavior 48 hours
13  later is -- adds nothing, I don't think, and certainly doesn't
14  talk about what is going on with him on bond.  It is no where
15  near when he was charged federally.  It was no where near when
16  he was arrested federally and brought before the Court.  And
17  it's not since then, just like the allegations in this case.
18  It's nearly three months ago.
19         So, you know, I suppose that Your Honor could look
20  at the circumstances of the offense itself as being a federal
21  offense and being somehow -- somewhat serious and weighing in
22  favor of detention.  But the fact that he got angry and yelled
23  at a police officer two days after that adds nothing to it.
24         And again, what we're talking about here is
25  conditions of bond, whether he can be supervised and whether

1    he's going to meet that -- those conditions of bond.

2            What I encourage the Court to focus on is we heard a
3    lot about what went on after court and in court a week ago.
4    We're in a dramatically different position now because now
5    what you have before you is a man who believes that the
6    problems that he saw, that the way that he was being pressured
7    and the misrepresentations that were being made are going to
8    be vindicated and that the system is going to work for him
9    because what he was dealing with on the couple of days that
10   we've been talking about in court was this incident happened,
11   again, back in March.

12           He was plucked out of his apartment by federal
13   agents having no idea what was happening.  Told not to worry.
14   You know, I understand that we're dragging you to another
15   district and bringing you to court, but, you know, we'll make
16   sure you don't get stranded there, and then stranding him
17   there.

18           So from his perspective, law enforcement lied to him
19   in a way to his detriment that left him in a city that he's
20   not familiar with without money, without a way -- without
21   embarrassing himself further to get in touch with his family
22   to try to get a ride.

23           And then when he was in court, again, listen to the
24   government make misrepresentations and take his job away.  I
25   think those are extraordinary things to happen to anyone.  And

1   when you put those together, he was in an extraordinary
2   situation.

3          Since then he has -- I've been able to deal with
4   him.  He's been able to speak to his union.  His union
5   president has been able to speak to American Airlines.  And
6   now he understands that whatever the government says, whatever
7   agents tell him, it will be tested in court and they won't be
8   able to get away with trying to take his job away based on
9   falsehoods and that he will have his day in court, which was
10  not what it was looking like for him a week ago.

11         He stands here absolutely contrite and ready to
12  follow whatever the Court's orders need to be and will do
13  wherever he needs to to be supervised and is very hopeful that
14  next week he'll be back working at his job with -- if the
15  Court will allow or give American Airlines the option to at
16  least consider that.

17         So for all those reasons, Judge, again, whatever the
18  parameters of this hearing are, I don't think at this point
19  there is a legal basis to put him in jail.  I think to the
20  contrary, the Court should continue him on the conditions that
21  he is under.  The probation department has great discretion as
22  far as where to supervise him and what conditions that they do
23  in terms of reporting and testing, mental health evaluations
24  and so forth.  I have no doubt they can handle him and they
25  will now that he knows what he needs to do and knows that he

1  does not need to fear that he's going to be railroaded.

2          So for all those reasons, Your Honor, I think

3  continuing him on conditions and allowing the probation

4  department the discretion and American Airlines the discretion

5  to deal with him as they think appropriate is sufficient at

6  this time.

7          MR. O'MALLEY:  Let me first of all -- I can't let

8  this rest.  I think it's irrelevant, but there's no

9  misrepresentation regarding the status about his job.  He may

10  have a lot of faith and he probably does and he has a very

11  strong union, which is why he acts the way he does at work,

12  which is why he thought he could get past a TSA officer and

13  said "bitch ass" N word and that he would kill the TSO and

14  kick his ass.  That's the charge in this case that gives rise

15  to federal offenses for which he heard he was facing ten

16  years' imprisonment.

17          And despite that, he's continued with that activity

18  two days later.  I don't care if it's two days later, three

19  days later or last week.  He said the same thing to a law

20  enforcement officer on the street.

21          So -- and you heard the testimony of Ms. Fackrell

22  that she just heard the probation officer say they didn't

23  accept him because they thought he was a ticking time bomb.

24          So whatever is going on in his head, it's not

25  reality.  And he chooses to obstruct justice or attempt to

1  obstruct justice or intimidate anybody in the legal system,

2  whether a law enforcement officer on the street, and his

3  behavior here before Your Honor one word away from being held

4  in contempt, and even after court his continual obstruction

5  with probation officers.  That's not the sign of somebody

6  who's scared about court because people scared about court

7  come in here and they honor what the Court tells them to do.

8  They follow the law.  They don't continue with this kind of

9  conduct.

10       So our position is he continues to be a time bomb

11  and we would say that the officer's testimony would be

12  relevant to proving that he's a serious risk.  That he'll

13  obstruct or attempt to obstruct justice, or threaten, injure

14  or intimidate, or attempt to threaten, injure or intimidate a

15  prospective witness.

16       If Your Honor doesn't want to go in that direction,

17  then we would request that you impose GPS ankle monitoring and

18  that any disrespectful or obstructive comment to a probation

19  officer or any question about what he's told to do, that would

20  be immediate cause for revocation.

21       THE COURT:  Do you want to say anything else, Mr.

22  Adolf?

23       MR. ADOLF:  No, Your Honor.  Thank you.

24       THE COURT:  Well, first of all, the Court has

25  inherent authority to enforce and review its own orders,

1  including orders that set conditions of release. So I'm

2  satisfied it's properly before the Court. And under

3  3142(f)(2), the Court may on its own motion conduct a

4  detention hearing. So I say that just to address the

5  procedural issue and find that it's properly before the Court.

6        And when the Court sets conditions of release and

7  the defendant lives outside this jurisdiction and he then has

8  to be supervised in another jurisdiction and he in effect

9  sabotages that supervision, I don't think that places the

10  Court in the position of having to go back to square one and

11  say, all right, we couldn't supervise him where he's supposed

12  to be supervised so now let's come up with another alternative

13  of how to supervise him.

14        I think then the question before the Court is are

15  there conditions that will ensure his appearance and that

16  he'll comply with? And he's had a record from the time he

17  came in here of not cooperating with probation and then,

18  number one, disobeying orders from probation officers and,

19  number two, doing it in a very defiant and disrespectful way.

20        So my -- for the Court the issue is, is he going to

21  be amenable to supervision? Is he going to be amenable to

22  conditions of release that will ensure his appearance? And I

23  just don't find that he is.

24        So the Court's going to order him detained so he's

25  remanded to the custody of the marshal.

1     (End of proceedings.)

2                         *****

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NORTH CAROLINA

3    CERTIFICATE OF REPORTER

4

5

6            I, Cheryl A. Nuccio, Federal Official Realtime Court

7    Reporter, in and for the United States District Court for the

8    Western District of North Carolina, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code, that

10   the foregoing is a true and correct transcript of the

11   digitally-recorded proceedings, transcribed to the best of my

12   ability, held in the above-entitled matter and that the

13   transcript page format is in conformance with the regulations

14   of the Judicial Conference of the United States.

15

16           Dated this 3rd day of July 2017.

17

18                        s/Cheryl A. Nuccio

19                        _____
                          Cheryl A. Nuccio, RMR-CRR
20                        Official Court Reporter

21

22

23

24

25